**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

MILDRED B. CALHOUN,

      Plaintiff,

vs.              Case No.  3:07-cv-970-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.
_____/

## **OPINION AND ORDER**[1]

Mildred B. Calhoun is appealing the Commissioner of the Social Security Administration's final decision denying her claim for Disability Insurance Benefits ("DIB"). Her alleged inability to work is based on left-sided weakness, arm pain, and dizziness, as well as high cholesterol, acid reflux, diabetes, glaucoma, high blood pressure, migraines, asthma, and depression. Transcript of Administrative Proceedings ("Tr.") at 52, 59, 94, 907-910. In a decision dated April 27, 2007, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled through the date last insured. Tr. at 21, 22 (Finding 7). Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court. The primary issue is whether the ALJ gave the retrospective medical opinions of Plaintiff's current treating physicians the appropriate weight. Because the ALJ articulated reasons supported by substantial evidence showing good cause on a sufficiently developed

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. Notice, Consent, and Order of Reference - Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 14).

record for discounting the opinions of the treating physicians, the decision of the ALJ will be affirmed.

## I. BACKGROUND

Plaintiff applied for DIB on November 5, 2004, alleging disability beginning July 15, 1995. Tr. at 14. The parties agree that Plaintiff was last insured for DIB on September 30, 2000, at which time she was fifty years old. Id.; see Memorandum in Support of Complaint (Doc. No. 15; "Plaintiff's Memorandum") at 1; Memorandum in Support of the Commissioner's Decision (Doc. No. 16; "Commissioner's Memorandum") at 2. Therefore, Plaintiff must establish that she was disabled on or before September 30, 2000 to show that she is entitled to DIB. See Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). The ALJ found that Plaintiff was not disabled prior to September 30, 2000 and issued a decision denying Plaintiff DIB on April 27, 2007. Tr. at 14-22. The Appeals Council denied review on September 28, 2007. Tr. at 5-7. On October 12, 2007, Plaintiff commenced this action by timely filing the Complaint (Doc. No. 1) seeking review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ "improperly evaluated the medical evidence in this record[.]" Plaintiff's Memorandum at 4 (capitalization omitted). Specifically, Plaintiff contends the ALJ had "an obligation and a duty to examine all medical records," including the records of Dr. Audrey Wooten and Dr. Sean C. Orr from after the date last insured that addressed the "same general medical problem" causing her alleged disability. Id. at 5. Plaintiff claims that "[i]t is not readily apparent from a review of the decision that the [ALJ] considered the evaluations of Drs. Wooten and Orr . . . ." Id. at 6. Additionally, Plaintiff

asserts that "[t]he testimony of an independent medical expert would have been helpful in this situation." Id.

### A. Medical History prior to September 30, 2000

On September 17, 1992, prior to the date Plaintiff was last insured (September 30, 2000), it appears Plaintiff suffered a stroke. Tr. at 224-25, 907. She was treated at the San Jose Medical Center in San Jose, California and was discharged on September 20, 1992. Tr. at 224-25. The discharge summary indicated a history of lacunar infarct, possibly related to a stroke, and left arm paresthesias about two weeks prior to admission. Id. Acute myocardial infarction was ruled out. Id. When she was examined on September 17, 1992, Plaintiff denied any other transient ischemic attack or neurological symptoms. Tr. at 226. An echocardiogram was performed to rule out significant cardiac valvular disease, and it was determined that the left ventricle showed no evidence of mural clot. Tr. at 225. Left ventricular function and ejection fraction were normal; the right atrium, right ventricle, and left atrium were all normal and without clot; the aortic and tricuspid valves were normal; the mitral valve was a bit thickened but was without definite prolapse; and the pulmonic valve was normal except for minimal pulmonic insufficiency. Id. Plaintiff experienced burning central chest pain, which was relieved somewhat by nitroglycerin. Id. Dr. Kam Tabari, who examined Plaintiff for cardiac problems on September 20, 1992, did not feel there was a strong likelihood of clinically significant coronary heart disease. Tr. at 229. When Plaintiff was discharged, Dr. Steven Simon, who signed the discharge summary, did not specifically restrict Plaintiff's activities; he provided discharge instructions which stated, "Activities - as

tolerated." Tr. at 225. The discharge instructions provided to Plaintiff stated, "Discharge Instructions - Activity: Ambulate as tolerated." Tr. at 248 (capitalization omitted).

On November 6, 1992, Plaintiff was admitted to the San Jose Medical Center due to considerable weakness in the left upper and lower extremities. Tr. at 317. These symptoms improved during her hospitalization. Id. It was noted that a cervical spine x-ray demonstrated mild degenerative changes in the cervical spine. Tr. at 318. There was an extensive workup, including MRI, a brain scan, and lab work. Tr. at 321. Plaintiff "was also having, approximately one month [prior to the November 6, 1992 hospitalization], some episodes of vague fatigue and light headedness that subsequently resolved, and she has been back to work." Id. When Plaintiff was discharged on November 8, 1992, she was eating well, ambulating well, afebrile, with stable vital signs. Tr. at 318. Dr. Paul Singer's impression was that there was recurrent left arm, greater than leg weakness, associated with occipital pain, and that there could be recurrent right cerebral vascular episode, though he tended to doubt this as no other etiology for stroke-like episodes appeared during the previous workup. See Tr. at 322. Dr. Singer identified other possibilities: demyelinating and lumbar puncture, as well as cervical spine process. Id. Dr. Singer also raised the possibility of some emotional component. Id. Plaintiff was discharged on November 8, 1992 with instructions that she should not work for one to two weeks, and she should rest. Tr. at 331. Plaintiff underwent a cerebral angiogram procedure on November 17, 1992, and she was discharged with instructions to ambulate as tolerated, not to lift anything heavy, and not to drive. Tr. at 373, 388.

Almost four years later, on August 16, 1996, Plaintiff was admitted to the San Jose Medical Center. See Tr. at 391-467, 907. Plaintiff was in her usual state of health, except for suffering a migraine headache the day before, when she became weak, dizzy, and unable to speak while she was walking with a friend. Tr. at 394. Plaintiff had trouble speaking upon arrival at the hospital, but her condition improved somewhat. Id. An Occupational Therapy Evaluation from August 18, 1996 indicated that Plaintiff "works as a caterer." Tr. at 426. Although there was a "complete loss of function in [left] hand," the notes also indicated this was "inconsistent." Id. Plaintiff's goal was to "get better," and the prognosis was "good." Id. Occupational therapy was recommended three to five times per week for three weeks. Id.; see also Tr. at 428, 431 (noting moderate cognitive and verbal expression deficits and recommending speech therapy treatment three to five times per week for one week). Plaintiff was discharged on August 19, 1996, and she was advised to follow up with Dr. Floyd and Dr. Singer. Tr. at 460. The Discharge Instructions did not restrict Plaintiff's activities. Id.

On October 10, 1999, Plaintiff was admitted to Regional Medical Center of San Jose after experiencing severe chest pain and tingling in her left arm. Tr. at 469, 471, 476. Dr. Howard E. Michaels stated that Plaintiff took nitroglycerin, which made her feel better, and she was transferred to the emergency room for further workup. Tr. at 476. It was indicated that Plaintiff "had a treadmill approximately two weeks ago with Dr. Lopez and was told that everything was 'OK.'" Id. There were no discharge instructions, and the discharge diagnosis stated, "Angina with resolution with nitroglycerin." Tr. at 477.

**B.  Treatment History after September 30, 2000**

After September 30, 2000, Plaintiff's last date insured for DIB, she saw treating physicians who offered assessments more directly related to Plaintiff's residual functional capacity.  Because Plaintiff's argument is that the ALJ did not properly consider the opinions of Dr. Wooten and Dr. Orr, the Court directs its inquiry to these physicians' assessments of Plaintiff.

Dr. Wooten treated Plaintiff beginning in 2002 for hypertension,[2] diabetes,[3] myotonic dystrophy type 2,[4] gynecological issues,[5] hyperlipidemia,[6] rhinitis,[7] bilateral left hand pain/stiffness,[8] dizziness/vertigo,[9] back pain,[10] hypercholesterolemia,[11] gastroesophageal reflux disease,[12] and colds/flu.[13]  Plaintiff complained of side numbness on June 18, 2004. Tr. at 134, 663.  Dextroconvex scoliosis of the spine was also indicated.  Tr. at 131, 141.  It appears these conditions were generally under control.  Tr. at 124-50, 197-204, 644-667.

Dr. Wooten completed a physical medical assessment of Plaintiff on November 22, 2005. Tr. at 645-49.  Dr. Wooten's assessment was based on Plaintiff's left-sided numbness and weakness, CVA (cerebral vascular accident).  See id.  According to Dr. Wooten's assessment, Plaintiff could occasionally lift and/or carry up to twenty pounds, and Plaintiff

---

[2] Tr. at 128, 135, 199, 201, 651, 654, 656, 658, 664
[3] Tr. at 128, 199, 201, 654, 656, 658
[4] Tr. at 135, 146, 199, 654, 656, 664
[5] Tr. at 128, 201, 651, 658
[6] Tr. at 135, 140, 199, 654, 656, 664, 666
[7] Tr. at 137, 140, 661, 666
[8] Tr. at 130, 137, 143, 661
[9] Tr. at 137, 661
[10] Tr. at 144
[11] Tr. at 149
[12] Tr. at 651
[13] Tr. at 136, 140, 146, 149, 666

could sit four hours per day, stand one hour per day, and walk one hour per day. Tr. at 645-46.[14]  Dr. Wooten indicated that Plaintiff's use of her hands was not affected by her medical condition, and she could occasionally climb stairs, balance, stoop, crouch, and kneel, but she could never crawl. Tr. at 647.  Dr. Wooten opined that Plaintiff frequently had pain severe enough to interfere with her attention and concentration; that she would need a job that permits shifting at will from sitting, standing, or walking; that she would have to take unscheduled breaks during an eight-hour day; and that she would be expected to miss more than seven days from work a month. Tr. at 648.  Dr. Wooten believed this condition could be expected to last at least twelve months. Id.  However, Dr. Wooten did not state the earliest date to which the description of symptoms and limitations in the medical assessment applied. Tr. at 649.

Dr. Orr began treating Plaintiff in June of 2005. Tr. at 621, 854.  Plaintiff had possibly suffered strokes in 2003 and in 2005–shortly before she was evaluated by Dr. Orr.  See Tr. at 119, 531-34, 632, 907.  Plaintiff went to Dr. Orr with complaints of wrist and left shoulder pain. Tr. at 622, 632, 633.  Plaintiff was also treated for headaches. Tr. at 720-22.  Dr. Orr believed Plaintiff likely was suffering peripheral neuropathy and a vitamin B12 deficiency, as well as cervical degenerative disc disease. Tr. at 632, 722.  He also suggested there could be some depression. Tr. at 632.

Dr. Orr completed a physical medical assessment of Plaintiff on or about December 27, 2006. Tr. at 872-76.  Dr. Orr based his assessment on Plaintiff's weakness and sensory loss following stroke. Id.  According to Dr. Orr, Plaintiff could never lift or carry any amount

---

[14] "Occasionally" is defined as "Very little to One-Third of an 8-hour day." See Tr. at 645.

-7-

of weight, and she could never climb, balance, stoop, crouch, kneel, or crawl. Tr. at 872-74. Dr. Orr indicated that Plaintiff could sit two hours per day, but she could not stand or walk at all during an eight-hour day, and Plaintiff's hands were affected by her condition. Tr. at 873-74. Dr. Orr also believed that Plaintiff frequently had pain severe enough to interfere with her attention and concentration, and she would require a job that permitted shifting positions at will. Tr. at 875. Dr. Orr expected that Plaintiff would need to take unscheduled breaks during an eight-hour work day, that she would miss more than seven days of work per month, and that Plaintiff's condition would last more than twelve months. Id. It appears Dr. Orr opined that severe obstructive sleep apnea/hypopnea syndrome, excessive fatigue, chronic sleep deprivation, and cervical spinal stenosis also affected Plaintiff's ability to work at a regular job on a sustained basis. Id. Dr. Orr applied these symptoms and limitations back to 1992, when Plaintiff suffered her first stroke.[15]  Tr. at 876.

### C. The ALJ's Decision

Applying the required five-step sequential analysis[16] after reviewing all of the evidence, the ALJ concluded that Plaintiff had the residual functional capacity to perform light work activity as of September 30, 2000. Tr. at 17. The ALJ determined that although Plaintiff's history of cerebral vascular accident was a severe impairment, she could lift and

---

[15] It should be noted that this is before the date Plaintiff claims the onset of disability. Plaintiff's Memorandum at 1.

[16] The five-step sequential inquiry is set forth in 20 C.F.R. § 404.1520(a)(4) as well as § 416.920(a)(4). See also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). At Step 1, the ALJ determined that Plaintiff engaged in substantial gainful activity during the period from her alleged onset date for two years, but the amount was not sufficient to be considered. Tr. at 16. At Step 2, the ALJ determined that Plaintiff had a severe impairment (history of cerebral vascular accident) as of the last date insured. Tr. at 17. At Step 3, the ALJ determined that this severe impairment is not in the listing of impairments found at 20 C.F.R., Part 404, Subpart P, appendix 1. Id. At Step 4, the ALJ determined that Plaintiff's former work as a telemarketer did not require the performance of work-related activities precluded by her residual functional capacity. Tr. at 20. The ALJ concluded that Plaintiff was not disabled. Tr. at 21.

carry a maximum of 20 pounds occasionally and 10 pounds frequently, and that she could push and pull these weights.  Id.  The ALJ also found that Plaintiff could sit, stand, and/or walk about six hours each, as needed in an eight-hour work day, and that Plaintiff had no significant postural, environmental, communicative, manipulative, or visual limitations.  Id.

## II.  STANDARD OF REVIEW

This Court reviews the Commissioner's final decision as to disability[17] pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ."  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)).  "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'"  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

## III. DISCUSSION

Recognizing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," the Social Security Administration has promulgated regulations that instruct ALJs how to weigh

---

[17] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

the medical opinions[18] of treating physicians[19] properly. 20 C.F.R. § 404.1527(d)(2). A treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When the treating physician's medical opinion is not due controlling weight, the ALJ determines the appropriate weight it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician. Id.

If an ALJ concludes that the medical opinion of a treating physician should not be given at least substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" to discount the treating physician's medical opinion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence, (2) the evidence supports a contrary finding, or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not

---

[18] Medical opinions are statements from physicians that reflect judgments about the nature and severity of the claimant's impairment, including symptoms, diagnosis, prognosis, and what the claimant can still do despite the impairment. 20 C.F.R. § 404.1527(a)(2).

[19] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required the for the medical condition. See 20 C.F.R. § 404.1502.

accompanied by objective medical evidence). The ALJ must "state with particularity the weight he [or she] gave the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); see also MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

A claimant may rely on retrospective medical opinions of treating physicians. See Boyd v. Heckler, 704 F.2d 1207, 1211 (11th Cir. 1983), superseded by statute on other grounds as stated in Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). The retrospective medical opinion of a treating physician should be given at least substantial or considerable weight, unless it is inconsistent with or not supported by contemporaneous medical records. See Garvey v. Astrue, No. 1:07-cv-021-MP-WCS, 2007 WL 4403525, slip op. at *7 (N.D. Fla. Dec. 12, 2007) (citing Estok v. Apfel, 152 F.3d 636, 639 (7th Cir. 1998)). That is, there must be good cause to discount a treating physician's retrospective medical opinion. See Garvey, 2007 WL 4403525 at *7 (stating that "the ALJ must point to substantial evidence in the record to discount the opinion of a treating physician, whether retrospective, contemporary, or prospective"); see also Krueger v. Astrue, No. 2:06-cv-465-FtM-29SPC, 2008 WL 596780, slip op. at *10 (M.D. Fla. Feb. 29, 2008).

## IV. ANALYSIS

Plaintiff contends that the ALJ erred for two reasons: 1) the ALJ failed to give the opinions of Dr. Wooten and Dr. Orr the proper weight; and 2) the ALJ should have obtained the testimony of an independent medical expert. Id. at 6.

### A. Weight of the Opinions of Dr. Wooten and Dr. Orr

Plaintiff's contention that it is unclear whether the ALJ even considered the opinions of Dr. Wooten and Dr. Orr, see Plaintiff's Memorandum at 6, is unfounded. The ALJ specifically addressed the opinions of Dr. Wooten and Dr. Orr in her decision. Tr. at 19-20. The ALJ stated that "the opinions of the treating physician[s] cannot be afforded 'controlling weight' . . . ." Tr. at 20. The ALJ explained that Dr. Wooten treated Plaintiff for routine health and gynecological concerns, not for residual effects from her previous stroke or transient ischemic attack. Id. Dr. Wooten's records were "void of any significant complaint or observations regarding the claimant's history of stroke or residuals." Tr. at 20. In other words, the ALJ found that there was no objective medical evidence to corroborate Dr. Wooten's opinion of disability resulting from the stroke in 1992 or the probable transient ischemic attack in 1996, and that Dr. Wooten's physical medical assessment was inconsistent with Dr. Wooten's own medical records to the extent there were no significant complaints or observations related to Plaintiff's history of cerebral vascular accident or transient ischemic attack in the records. Id.[20]

Moreover, the ALJ explained that the opinions of both Dr. Wooten and Dr. Orr were inconsistent with the "more persuasive evidence." Id. The ALJ noted that Plaintiff exhibited symptoms consistent with transient ischemic attack in 1996, but "there were no significant findings on extensive workup." Tr. at 18. Although Plaintiff did experience some speech disruption, the ALJ found that this was resolved with therapy. Id. The ALJ stated that there

---

[20] As mentioned earlier, Dr. Wooten's physical assessment does not indicate the earliest date to which it applies. Tr. at 649. For purposes of this Opinion and Order, however, the Court assumes that it applies to a time prior to September 30, 2000, the date last insured.

is "no objective evidence of a significant event, based on the results of multiple studies," and that Plaintiff "was not under treatment for any type of physical residuals or complaints of extremity weakness." Tr. at 20. "There is no objective evidence of any complaints or observations of residual weakness, of a debilitating level." Id. The ALJ further observed that Plaintiff returned to work at the substantial gainful activity level after her stroke in 1992, and Plaintiff worked as a substitute teacher in 2002 and 2003, albeit not at the substantial gainful activity level. Id.; Tr. at 59-66; 900-01.

The ALJ did not explicitly state what weight was given to the opinion of Dr. Wooten as a strict reading of Sharfarz and MacGregor might arguably require. See Sharfarz, 825 F.2d at 279; MacGregor, 786 F.2d at 1053 (stating that the ALJ must "specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error"). However, there is no doubt that the ALJ gave Dr. Wooten's medical opinion minimal weight. See Tr. at 20. It is abundantly clear the ALJ concluded that Dr. Wooten's opinion was not supported by objective medical evidence, and that the evidence supported a finding contrary to Dr. Wooten's opinion. See id. The undersigned can see no useful purpose to be served by remanding this case solely to require the ALJ to state what is obvious. Remanding under these circumstances would be a "wasteful corrective exercise" as no further findings could be made that would alter the ALJ's determination. See Ware v. Schweiker, 651 F.2d 408, 412 (5th Cir. 1981);[21] compare Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (reversing the ALJ's decision when

---

[21] Decisions of the former Fifth Circuit handed down on or before September 30, 1981 are binding on district courts in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

it provided "no clue as to why he discounted the opinion" of a treating physician and no good cause was apparent in the record) with Phillips, 357 F.3d at 1241 (finding that the ALJ articulated several reasons for giving less weight to the treating physician's opinion, the Court "readily" concluded that the ALJ's determination was supported by substantial evidence).

It bears mentioning that the ALJ stated Dr. Orr's opinion was not given any weight because Dr. Orr did not treat Plaintiff until ten years after the alleged onset date and five years after the date last insured. Tr. at 20. To the extent this statement suggests that retrospective medical opinions from treating physicians may be given no weight merely because they are retrospective, it is an incorrect statement of the law. See Boyd, 704 F.2d at 1211. Nonetheless, the ALJ would have reached the same result because the ALJ also found that Dr. Orr's opinion was not corroborated by objective medical evidence, and indeed the evidence supported a finding contrary to Dr. Orr's opinion. Tr. at 20. These reasons amount to good cause to discount a treating physician's medical opinion. See Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583-84.

After a thorough review of the record, the undersigned finds that the ALJ's reasons for discounting the opinions of Dr. Wooten and Dr. Orr are supported by substantial evidence. The medical records show that Plaintiff probably suffered a cerebral vascular accident in September of 1992 and transient ischemic attack in August of 1996, but there is nothing to suggest that Plaintiff was permanently disabled by these incidents. Although Plaintiff did complain to Dr. Wooten of left wrist and shoulder pain, as well as side numbness, Tr. at 130, 134, 137, 663, these complaints were made in 2004–after Plaintiff suffered

another stroke in 2003.  See Tr. at 119, 907.  Dr. Wooten's records did not tie these complaints back to any of the incidents prior to September 30, 2000.  In addition, the discharge instructions from Plaintiff's hospitalizations in September of 1992, November of 1992, August of 1996, and October of 1999 did not restrict Plaintiff's activities in any way that would suggest long-term disability.  Tr. at 225, 248, 373, 388, 460, 477.  The History and Physical Examination notes from Plaintiff's hospitalization in August of 1996 indicated that Plaintiff "did have a stroke in 1992 which the patient had problems with speaking and also had weakness of the left leg, which has since resolved with physical therapy."  Tr. at 403.  The Occupational Therapy Evaluation from August 18, 1996 showed that Plaintiff was expected to recover with good results, and occupational therapy treatment was recommended for only three weeks.  Tr. at 426.  Furthermore, Dr. Crenshaw, one of Plaintiff's treating physicians, opined that Plaintiff could frequently lift or carry up to ten pounds, and she could occasionally lift up to fifty pounds and occasionally carry up to twenty pounds. Tr. at 505-06.[22]  According to Dr. Crenshaw, Plaintiff could stand, sit, and walk eight hours in an eight-hour workday as of May 2002.  Tr. at 506, 509.  Dr. Crenshaw's medical opinion was consistent with the ALJ's finding that Plaintiff had the residual functional capacity to perform light work activity through the date last insured.  See 20 C.F.R. § 220.132(b).  Plaintiff worked at the substantial gainful activity level as a telemarketer after her stroke in 1992, Tr. at 59, and Plaintiff stated on a questionnaire that the last date she worked her regular job was December 18, 2000.  Tr. at 500.  There is substantial evidence in the record

---

[22]   Dr. Crenshaw is an orthopedist who began treating Plaintiff after 2000.  See Tr.at 497-509.  Plaintiff concedes that there is no record of an orthopedic problem prior to September 30, 2000.  Plaintiff's Memorandum at 5.

to support the ALJ's decision to discount the opinions of Dr. Wooten and Dr. Orr, as well as the ALJ's finding as to residual functional capacity.

### B. Independent Medical Expert

Plaintiff also asserts–without citation to any legal authority–that the ALJ should have sought the opinion of an independent medical expert to determine when Plaintiff's condition deteriorated to the point she became disabled. Plaintiff's Memorandum at 6. "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary to make an informed decision. An ALJ, however, is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is unnecessary." Wind v. Barnhart, 133 Fed.Appx. 684, 693 (11th Cir. 2005) (unpublished) (citations omitted). The record here includes medical records and the physical medical assessments of Dr. Wooten, Dr. Orr, and Dr. Crenshaw. Tr. at 645-49, 872-76, 505-06. The ALJ determined that Plaintiff was not disabled prior to September 30, 2000, the date she was last insured for DIB. Tr. at 21. The record was sufficiently developed, and an independent medical expert was not necessary for the ALJ to make an informed decision. See Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).

### V. CONCLUSION

The ALJ articulated reasons supported by substantial evidence showing good cause for discounting the opinions of Dr. Wooten and Dr. Orr; therefore, the ALJ did not improperly weigh these treating physicians' medical opinions. In addition, the record in this case was

sufficient for a decision, so an independent medical expert was not necessary. Accordingly, it is

**ORDERED:**

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3) **AFFIRMING** the Commissioner's decision.

2. The Clerk of Court is directed to close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 23rd day of December, 2008.

                                                JAMES R. KLINDT
                                                United States Magistrate Judge

jdf
Copies to:
Counsel of record